# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| JBF BAHRAIN W.L.L., | : |
| as successor-in-interest to | : |
| JBF Bahrain S.P.C., | : |
| | : |
| Plaintiff, | : |
| | :    Court No. 23-00067 |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

_____ :

## <u>ORDER</u>

Upon consideration of defendant's cross-motion for partial summary judgment, plaintiff's motion for partial summary judgment, other papers on file, and upon due deliberation; it is hereby

**ORDERED** that defendant's cross-motion for partial summary judgment be and hereby is granted;

**ORDERED** that plaintiff's motion for partial summary judgment is denied;

**ORDERED** that partial summary judgment is entered for defendant consistent with Slip Op [x]; and

**ORDERED** that the parties shall submit a proposed scheduling order, within ten days of this order, to govern the remainder of the proceedings.


_____

JUDGE


Dated: _____

New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. M. MILLER BAKER, JUDGE

_____

| | | |
|---|---|---|
| JBF BAHRAIN W.L.L., | : | |
| as successor-in-interest to | : | |
| JBF Bahrain S.P.C., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 23-00067 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

_____

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

_____

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

|  | MARCELLA POWELL |
| Of Counsel: | Senior Trial Counsel |
| Taylor R. Bates | Civil Division, U.S. Dept. of Justice |
| Office of the | Commercial Litigation Branch |
| Assistant Chief Counsel | 26 Federal Plaza, Room 346 |
| International Trade Litigation | New York, New York 10278 |
| U.S. Customs and | Tel. (212) 264-9230 |
| Border Protection | Attorneys for Defendant |

Dated: December 12, 2025

# TABLE OF CONTENTS

RELEVANT STATUTORY PROVISIONS ...............................................2

QUESTIONS PRESENTED ...................................................................2

INTRODUCTION.................................................................................2

  I.    The United States-Bahrain Free Trade Agreement .......................4

  II.   The Merchandise At Issue .........................................................7

SUMMARY OF THE ARGUMENT .......................................................8

ARGUMENT ....................................................................................10

  I.    STANDARD FOR SUMMARY JUDGMENT.............................10

  II.   THE GOVERNMENT'S CROSS-MOTION FOR PARTIAL
        SUMMARY JUDGMENT SHOULD BE GRANTED.................11

    A. General Note 30, HTSUS, Controls The Rules Of Origin
       Determination For Preferential Treatment Under
       the UBFTA ...........................................................................14

      1. General Note 30, HTSUS, Contains Both A "New Or
         Different Article Of Commerce" Requirement and a 35%
         Value-Content Requirement ...........................................14

        a.   General Note 30(b)(ii) ...............................................16

        (1)"New or Different Article of Commerce That Has Been
          Grown, Produced or Manufactured in the Territory of
          Bahrain" .................................................................15

            i.    Substantially Transformed...............................16
            ii.   New Name, Character, or Use...........................18

        (2) The 35% Value Content Requirement .......................18

a. Value of Materials Produced in the Territory of Bahrain ........ 19

II.   THE SIDE LETTER AND CBP'S REGULATIONS CANNOT
      SUPPLANT THE RULES OF ORIGIN CONTAINED IN
      GENERAL NOTE 30, HTSUS.................................................... 27

III.  CBP'S ADMINSTRATIVE RULING IS NOT CONTROLLING
      IN THIS *DE NOVO* ACTION................................................... 27

CONCLUSION ...................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Alcan Aluminum Corp. v. United States,*
165 F.3d 898 (Fed. Cir. 1999).................................................. 11, 12, 25, 27

*Bufkin v. Collins,*
145 S. Ct. 728 (2025) .................................................................. 24

*Duncan v. Walker,*
533 U.S. 167 (2001) ................................................................... 24

*Marathon Poil Co. v. United States,*
93 Supp.2d 1277 (Ct. Int'l Trade 2000)....................................... 9

*Meyer Corp., U.S. v. United States,*
43 F.4th 1325 (Fed. Cir. 2022) .................................................. 21

*Torrington Co. v. United States,*
764 F.2d 1563 (Fed. Cir. 1985)..................................... 21, 22, 23, 24, 25

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001) ..................................................................... 24

## Harmonized Tariff Schedule Of The United States

General Note 30............................................................................ *passim*

General Note 30 (b) ................................................................... 11

General Note 30 (b)(i)................................................................ 13

General Note 30 (b)(ii)................................................................ *passim*

General Note 30 (b)(iii)................................................................13

General Note 30 (c)........................................................13, 17, 18

General Note 30 (d)(i)................................................................13

General Note 30 (d)(iv)..............................................................14

General Note 30 (d)(iv)(B)..................................................17, 19

General Note 30 (d)(iv)(C).................................................. 17, 18

General Note 30 (d)(iv)(D)............................................15, 16, 19

General Note 30 (d)(iv)(H)........................................................15

General Note 30 (d)(iv)(H)(1)(aa) .............................................16

General Note 30 (d)(iv)(H)(1)(bb) .............................................16

General Note 30 (d)(iv)(H)(1)(cc) .............................................16

General Note 30 (d)(iv)(H)(2) ...................................................16

General Note 30 (e) ...................................................................13

General Note 30 (g) ...................................................................13

General Note 30 (h) ...................................................................13

## Statutes

19 U.S.C. § 3805(a)(1)(C).............................................................4

19 U.S.C. §§ 2461-2465 .................................... 20, 22, 23, 24

1988 U.S.C.C.C.A.N. 2394 ..................................................9

United States-Bahrain Free Trade Implementation Act, Pub.L.109-169, 119 Stat 3581 ................................................................. 4

Section 103 (a)(1) of the Implementation Act .......................................... 4

Section 202 of the Implementation Act ................................................... 6

Omnibus Trade and Competitiveness Act of 1988 .................................. 6

The United States-Bahrain Free Trade Agreement (UBFTA) ..... *passim*

## Regulations

19 C.F.R. § 10.177(a) ............................................................................ 21

19 C.F.R. §§ 10.801-10.827 ................................................................... 6

19 C.F.R. §§ 10.809(i) ........................................................................... 6

19 C.F.R. §102.20 .................................................................................. 3

## Other Authorities

Presidential Proclamation 8039 .............................................................. 5

U.S. Bahrain Free Trade Agreement: Potential Economywide and Selected Sectoral Effects (October 2004) (ITC Publication 3276) ......... 25

HQ290625 (June 7, 2022) ...................................................................... 26

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| _____ | | |
| JBF BAHRAIN W.L.L., | : | |
| as successor-in-interest to | : | |
| JBF Bahrain S.P.C., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 23-00067 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR <u>PARTIAL SUMMARY JUDGMENT</u>

Defendant, the United States (the Government), submits this memorandum in opposition to plaintiff's motion for partial summary judgment and in support of its cross-motion for partial summary judgment. For the reasons set forth below, we respectfully request that the Court enter an Order granting our cross-motion for partial summary judgment and denying plaintiff's motion for partial summary judgment.

1

## RELEVANT STATUTORY PROVISIONS

The relevant statutory provisions are contained in Addendum A to this memorandum.[1]

## QUESTION PRESENTED

1.    Whether plaintiff's reliance on the Agreement between the Government of the United States and the Government of the Kingdom of Bahrain on the Establishment of a Free Trade Area (Executive Agreement) and a "Side Letter on Tariff Classification" (Side Letter), rather than General Note 30, Harmonized Tariff Schedule of the United States (HTSUS), to determine the eligibility of its goods for preferential tariff treatment is permissible under U.S. law.

2.    Whether under, General Note 30(b)(ii)(A), HTSUS, a foreign component used in the production of the imported good must first be transformed into a material produced in the territory of Bahrain and then transformed again into the final imported good before its value can be included in the 35% value content requirement.

---

[1] All references to the Harmonized Tariff Schedule of the United States (HTSUS) are to the 2015 Preliminary Edition, the HTSUS Edition in effect on the date the subject merchandise was entered.

# INTRODUCTION

The United States-Bahrain Free Trade Agreement (UBFTA or Executive Agreement) provides preferential duty treatment for certain originating goods. Through this action, plaintiff seeks duty-free treatment under the UBFTA for its imported biaxially oriented polyethylene terephthalate (PET) film (BOPET film). The rules of origin contained in General Note 30, HTSUS, are controlling, and require a dual transformation when applying its value content requirement. Plaintiff cannot circumvent General Note 30, HTSUS, by relying on documents that do not have the force of law.

Discovery in this action has been stayed to allow the parties to move for partial summary judgment on the threshold legal issue of the eligibility requirements for preferential treatment under the UBFTA. A ruling from the Court, at this time in the litigation, will promote judicial economy and conserve party resources. Specifically, a decision on the legal issue would allow the parties to determine whether this action can be resolved without further judicial intervention based on the discovery that has already been exchanged. Or, if it cannot, the parties will then proceed to the next phase of this litigation and conduct

additional discovery on whether plaintiff can satisfy the eligibility requirements.

## I.    <u>The United States-Bahrain Free Trade Agreement</u>

The Office of the United States Trade Representative (USTR) entered into treaty negotiations with the Kingdom of Bahrain (Bahrain) on January 26, 2004, and the parties signed an Executive Agreement on September 14, 2004.  Ex. A.  The Executive Agreement provides for preferential tariff treatment for certain goods produced in, and imported from, Bahrain.  On the same day, the parties to the Executive Agreement also entered into a Side Letter, Ex. B, which provides in pertinent part that:

> [f]or purposes of determining whether a good is a "new or different article of commerce that has been grown, produced, or manufactured" for the purposes of Article 4.1(b) of the Agreement, each Party should be guided by the specific rules in tariff classification set forth in section 102.20 of the United States Customs Regulations (19 CFR 102.20) ("Specific Rules"), as may be amended.

On November 16, 2005, the Office of the President submitted to Congress the documents (Supporting Documents) required by the Bipartisan Trade Promotion Authority Act of 2002, 19 U.S.C. § 3805(a)(1)(C), for Congress to approve the implementation of the

Executive Agreement.[2]  Ex. C, Supporting Documents.  The Side Letter

was not among those Supporting Documents.  *Id*.  Congress enacted the

United States-Bahrain Free Trade Agreement Implementation Act

(Implementation Act) on January 11, 2006.[3]  Pub. L. No. 109-169, 119

Stat 3581 (2006).

---

[2] "When the President formally submits a trade agreement to Congress under section 2105 of the [Bipartisan Trade Promotion Authority] Act [of 2002], the President must include in the submission the final legal text of the agreement, together with implementing legislation, a Statement of Administrative Action (describing regulatory and other changes that are necessary or appropriate to implement the agreement), a statement setting forth the reasons of the President regarding how and to what extent the agreement makes progress in achieving the applicable policies, purposes, priorities, and objectives set forth in the Act, and a statement setting forth the reasons of the President regarding how the agreement serves the interests of U.S. commerce."  S. REP. 109-199 (Dec. 8, 2005).

[3] Generally, the United States Constitution vests the President with the power to enter into treaties with foreign governments with the advice and consent of two-thirds of the Senate.  Const. art. II § 2.  However, 19 U.S.C. § 3803(b) allows the President to forgo the constitutional treaty ratification process "whenever the President determines that . . . existing duties . . . are unduly burdening and restricting the foreign trade of the United States . . . ."  19 U.S.C. § 3803(b)(1)(A)(i).  In such instances, the President "may enter into trade agreements with foreign countries providing for . . . the reduction or elimination of a duty . . ." after certain procedural requirements are met.  *Id*.  § 3803(b)(1)(B)(i)*; see generally id*. §§ 3804 (consultations and assessment); 3805 (implementation of trade agreements).  An agreement, such as the agreement at issue here, entered into by the United States using this procedure is incorporated into domestic law "if

Pursuant to Section 103(a)(1) of the Implementation Act, the President of the United States may proclaim necessary modifications to the HTSUS to implement certain articles of the Executive Agreement that are consistent with the Implementation Act.  Accordingly, on July 27, 2006, President George W. Bush issued Proclamation 8039, modifying the HTSUS to include "rules for determining whether goods imported into the United States are eligible for preferential tariff treatment under" the Executive Agreement.  Indeed, the Proclamation states:

> (1) *In order to provide generally for the preferential tariff treatment being accorded under the USBFTA, to set forth rules for determining whether goods imported into the customs territory of the United States are eligible for preferential tariff treatment under the USBFTA*, to provide certain other treatment to originating goods for the purposes of the USBFTA, to provide tariff-rate quotas with respect to certain originating goods, to

---

(and only if)" in addition to meeting the procedural requirements, Congress passes an implementation act.  *Id.* § 3805(a)(1)(C)-(D); *see generally*, *Medellín v. Texas*, 552 U.S. 491, 505 (2008) ("[W]hile treaties 'may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys and intention that it will be "self-executing" and is ratified on these terms." (quoting *Igartua–De La Rosa v. United States*, 417 F.3d 145, 150 (C.A.1 2005) (en banc) (Boudin, C. J.)).

reflect Bahrain's removal from the enumeration of designated beneficiary developing countries for purposes of the GSP, *and to make technical and conforming changes in the general notes to the HTS, the HTS is modified as set forth in Annex I of Publication 3830 of the United States International Trade Commission, entitled, Modifications to the Harmonized Tariff Schedule of the United States to Implement the United States-Bahrain Free Trade Agreement (Publication 3830), which is incorporated by reference into this proclamation.*

Presidential Proclamation 8039. (emphasis added).  Ex. D.  Pursuant to the proclamation, General Note 30 was added to the HTSUS by the United States International Trade Commission (ITC),[4] and it substantively mirrors section 202 of the Implementation Act.

The Implementation Act also directs U.S. Customs and Border Protection (CBP or Customs) to prescribe any regulations that may be necessary to carry out its provisions.  CBP's implementing regulations are set forth at 19 C.F.R. §§ 10.801-10.827.  To account for the Side Letter in its regulations, CBP promulgated 19 C.F.R. § 10.809(i) which

---

[4] The ITC's Office of Tariff Affairs and Trade Agreements is responsible for maintaining and publishing the HTSUS as directed by Congress in the Omnibus Trade and Competitiveness Act of 1988.

provides that "[a] 'new or different article of commerce" exists when the country of origin of a good which is produced in a Party from foreign materials is determined to be that country under the provisions of 102.1 through 102.21 of this chapter [.]"[5]

## II.  **The Merchandise At Issue**

The merchandise at issue is BOPET film imported from Bahrain. The BOPET film is manufactured, in part, with various types of non-Bahraini (and non-U.S.) PET chips imported into Bahrain for use in the production of the merchandise at issue prior to its importation into the United States.

## SUMMARY OF THE ARGUMENT

Plaintiff, JBF Bahrain W.L.L. (JBF Bahrain), seeks preferential duty treatment for its imported BOPET film under the USBFTA, and argues that a "double substantial transformation" is not required. JBF Bahrain's argument, however, relies on materials that do not have the force of law. Neither the Executive Agreement nor the Side Letter have any legal effect under U.S. Law. Indeed, both Congress and the

---

[5] The provisions of sections 102.1 through 102.21 are collectively referred to as the "Part 102 Rules."

President made clear that General Note 30, HTSUS, is the controlling authority that sets forth the eligibility criteria for preferential treatment.

Under General Note 30, HTSUS, if an imported good is not wholly the growth, product or manufacture of Bahrain or the United States or both, the Note requires that the imported good be a "new or different article of commerce" **and** the satisfaction of a 35% value content requirement. Those are two separate and distinct prerequisites. To establish a "new or different article of commerce," a substantial transformation, as defined in General Note 30, HTSUS, is required. However, the 35% value content requirement also requires a transformation. Only Bahrani materials can be counted towards the 35% value content threshold, and that means that foreign inputs must first be made into a Bahraini material and then that material is then used to make the imported good. In other words, the 35% value content requires a dual transformation.

# ARGUMENT

## I.    STANDARD FOR SUMMARY JUDGMENT

This Court reviews questions of law *de novo*.  *Marathon Oil Co. v. United States*, 93 F. Supp. 2d 1277 (Ct. Int'l Trade 2000).  As we establish below, the controlling rules of origin are set forth in General Note 30, HTSUS.  The Note requires that imported merchandise made with inputs from countries other than the United States or Bahrain, like plaintiff's goods, be a "new or different article of commerce" **and** satisfy the 35% value-content requirement in order to receive preferential duty treatment.  The content requirement is significant as it ensures that inputs of non-Bahraini (or non-U.S.) origin be converted into Bahraini "materials," as that term is defined by General Note 30, which are then used in the manufacture of the finished product that is imported into the United States, before those materials may be counted toward the 35% value-content requirement.[6]  Thus, the 35% value-

---

[6] The parties' motions are confined to the legal question of the proper eligibility requirements for preferential tariff treatment under the UBFTA.  The Government does not concede that JBF Bahrain's imported merchandise satisfies any of the criteria for such treatment. The Court's ruling on the eligibility requirements will enable the

content requirement compels a "dual transformation."  Plaintiff makes no effort to interpret General Note 30 -- which is a statute -- and instead incorrectly relies on the Executive Agreement and Side Letter, which have no independent effect under U.S. law.

## II.   THE GOVERNMENT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED

### A.   General Note 30, HTSUS, Controls The Rules Of Origin Determination For Preferential Treatment Under The UBFTA

JBF Bahrain seeks preferential duty treatment for its imported BOPET film under the UBFTA, and argues that the UBFTA, Side Letter and CBP's implementing regulations are the controlling sources for determining whether its film is eligible for such treatment. Specifically, according to JBF Bahrain, the Side Letter was "incorporated into the final text of the USBFTA as an attachment to Article 4 and is part of the Agreement."  Pl. Br. at 11.  JBF Bahrain further argues that because Congress directed Customs to promulgate regulations to implement the Agreement, Congress "intended for

---

parties to present their factual arguments for a determination as to whether plaintiff has satisfied that criteria.

.

11

Customs to implement the rules of origin, including the Side Letter on Tariff Classification." *Id.* at 12. JBF Bahrain concludes that those rules do not require a "double substantial transformation." *Id.* at 10. JBF Bahrain's legal analysis is incorrect. JBF Bahrain misunderstands the legal significance of the Executive Agreement, Side Letter, and Implementation Act.

The Executive Agreement is not self-executing and has no independent effect under U.S. law. *See Alcan Aluminum Corp. v. United States*, 165 F.3d 898, 904 (Fed. Cir. 1999) ("The [Free-Trade Agreement] is not self-executing and has no independent effect under U.S. law.") (*quoting* S. Rep. No. 100-509, at 1988, reprinted in 1988 U.S.C.C.A.N. 2395, 2404)). Moreover, Congress did not adopt or incorporate the Side Letter into the Implementation Act. Congress knows how to incorporate a side letter into an implementation act. *See* PL 100-449, 102 Stat 1851 (1988) sec. 101(a)(2)(A) (Congress expressly identifies and codifies "letters exchanged between the Governments of the United States and Canada . . . relating to negotiations regarding articles 301 (Rules of Origin) . . . of the Agreement[.]"). Thus, Congress's enactment of the Implementation Act relegated the

Executive Agreement and Side Letter to legislative history, leaving

them without any legal force.  The Executive Agreement and Side

Letter do not dictate the governing criteria for preferential treatment.

As we show below, the governing rules of origin for preferential

treatment under the UBFTA are set forth in General Note 30, HTSUS,

which is a statute.  *See*, *e.g.*, *Alcan Aluminum Corp.*, 165 F.3d at 904

("There is thus a critical distinction between [the HTSUS note] and the

Free-Trade Agreement: the former has actual legal effect in this case;

the latter does not.")

General Note 30 was added to the HTSUS, as rules "for

determining whether goods imported into the customs territory of the

United States are eligible for preferential treatment under the" UBFTA.

Ex. D, Proclamation 8039.  The Note's opening sentence is direct and

unambiguous:

> Originating goods under the terms of the United
> States-Bahrain Free Trade Agreement (UBFTA)
> are subject to duty as provided herein.

General Note 30, HTSUS.  Both Congress and the President directed

that imported goods can only qualify for preferential treatment if they

meet the rules of origin set forth in General Note 30, HTSUS.  As we

show below, General Note 30, HTSUS, requires a dual transformation when applying the value-content requirement.

### 1. General Note 30, HTSUS, Contains Both A "New Or Different Article Of Commerce" Requirement and a 35% Value-Content Requirement

General Note 30, HTSUS, provides a comprehensive framework for determining whether goods are originating. Because the imported BOPET film at issue is manufactured, in part, with non-Bahraini (or non-U.S.) PET chips (*see* Pl.'s Br. at 19), General Note 30, HTSUS, requires two primary showings (1) that the finished good imported into the United States is a "new or different article of commerce" and (2) that it satisfies the 35% value-content requirement.

General Note 30, HTSUS, provides in relevant part, that:

> (b)  For the purposes of this note, subject to the provisions of subdivisions (c), (d), (e), (g) and (h) thereof, a good imported into the United States is eligible for treatment as an originating good of a UBFTA country under the terms of this note only if –
>> (i) the good is a good wholly the growth, product or manufacture of Bahrain or of the United States, or both;
>> (ii) for goods not covered by subdivision (b)(iii) below, the good is a new or different article of commerce that has been grown, produced or manufactured in the territory of Bahrain or of the United States, or both, and the sum of--

> (A) the *value of each material produced in the territory of Bahrain* or of the United States, or both, and
> (B) the direct costs of processing operations performed in the territory of Bahrain or of the United States, or both,
> is not less than 35 percent of the appraised value of the good at the time the good is entered into the territory of the United States; or
>> (iii) the good falls in a heading or subheading covered by a provision set forth subdivision (h) of this note . . .
> and is imported directly into the territory of the United States from the territory of Bahrain *and meets all other applicable requirements of this note.* For purposes of this note, the term "good" means any merchandise, product, article or material.

(emphasis added).

General Note 30, HTSUS, makes clear that subject to the provisions of subdivisions (c), (d), (e), (g), and (h), the imported good is only an originating good of a UBFTA country if it also satisfies subdivision (b), which has three requirements. In this case, the parties agree that the imported good at issue is **not** "wholly the growth, product or manufacture of Bahrain, the United States or both." Pl.'s Br. at 5 (" . . .PET chips imported from outside of Bahrain and United States . . .") and No. 1, Def.'s Statement of Material Facts Not In Dispute. Therefore, the requirements of subdivision (b)(i), as defined in General Note 30(d)(i), are not met. The parties also agree that subdivision

(b)(iii) is inapplicable to the facts of this case.  Pl.'s Br. at 14.  Therefore,

the pertinent subdivision for the analysis in this case is subdivision

(b)(ii) of General Note 30.

### a.　General Note 30(b)(ii)

Subdivision (b)(ii) to General Note 30 has several distinct

requirements, *and those requirements rely on the definitions that are set

forth in the Note*.  The first requirement is that the good must be a "new

or different article of commerce that has been grown, produced or

manufactured in the territory of Bahrain or of the United States, or

both."

### (i)　"New or Different Article of Commerce That Has Been Grown, Produced or Manufactured in the Territory of Bahrain"

The first requirement within subdivision (b)(ii) is that the

imported good be "a new or different article of commerce that has been

grown, produced or manufactured in the territory of Bahrain or of the

United States, or both."  Subdivision (d)(iv) of General Note 30 sets

forth the definition of "new or different article of commerce" and states:

> (iv) <u>Definitions</u>. For the purposes of this note:
>   (D) The term "new or different article of commerce" means,
>   except as provided in this subdivision, a good that –
>     (1)　has been substantially transformed from a good
>         or material that is not wholly the growth,

> product or manufacture of Bahrain or of the
> United States, or both; and
>
> (2)   has a new name, character or use distinct from
> the good or material from which it was
> transformed,
>
> but a good shall not be considered a new or different
> article of commerce by virtue of having undergone
> simple combining or packaging operations, or mere
> dilution with water or another substance that does
> *not materially alter the characteristics of the good.*

Each of the two requirements in subdivision (d)(iv)(D), for
evaluating whether an item constitutes a "new or different article of
commerce," is analyzed in turn.

### a.   <u>Substantially Transformed</u>

First, the finished imported good must have been substantially
transformed from a "good or material that is not wholly the growth,
product or manufacture of Bahrain or the United States, or both." This
analysis requires determining whether the finished imported good was
"substantially transformed" in Bahrain from materials that are not of
Bahraini origin. Stated differently, any non-Bahraini materials used in
the production of the finished imported good must be substantially
transformed in Bahrain for the finished imported good to be considered
a new or different article of commerce that has been grown, produced or
manufactured in Bahrain.

17

Subdivision (d)(iv)(H) of General Note 30 states that:

> [t]he term "substantially transformed" means, with respect to a good or material, changed as the result of a manufacturing or processing operation so that:
>
> 1.   (aa) the good or material is converted from a good that has multiple uses into a good or material that has limited uses;
>       (bb) the physical properties of the good or material are changed to a significant extent; *or*
>       (cc) the operation undergone by the good or material is complex by reason of the number of processes and materials involved and the time and level of skill required to perform those processes; and
>
> 2.   the good or material loses its separate identity in the manufacturing or processing operation.

Based on these definitions, any non-Bahrani materials used in the production of the finished imported good must be substantially transformed by meeting the requirements of subdivision (d)(iv)(H)(1)(aa), (bb) or (cc), in addition to meeting the requirements of subdivision (d)(iv)(H)(2).

b.    <u>New Name, Character, or Use</u>

In addition, to be a "new or different article of commerce," the finished imported good must also have "a new name, character, or use distinct from the good or material from which it was transformed." Gen. N. 30(d)(iv)(D).  General Note 30 does not contain a definition of "new name, character or use."

## (2)   The 35% Value Content Requirement

The second requirement of subdivision (b)(ii) of General Note 30 mandates that the sum of: "(a) the value of each *material* produced in the territory of Bahrain, and (B) the direct costs of processing operations performed in the territory of Bahrain, is not less than 35 percent of the appraised value of the imported good at the time the good is entered into the territory of the United States." (emphasis added). Gen. N. 30(b)(ii).  This requirement is informally referred to as the "35% value content requirement."

### i.   Value of Materials Produced in the Territory of Bahrain

The meaning of the statutory phrase "value of each material produced in the territory of Bahrain" is critical because it sets forth which materials are to be included in the 35% value content requirement.  Three subdivisions within General Note 30 are particularly relevant, namely, subdivision (c), providing direction on determining the "[v]alue of materials;" subdivision (d)(iv)(C), defining "material produced in the territory of Bahrain or of the United States, or both;" and subdivision (d)(iv)(B), defining "material."

First, General Note 30(c) sets forth the statutory method for determining the "value of materials" used to satisfy the 35% value content requirement. To determine whether a particular item qualifies as a "material" and, more specifically, a "material produced in the territory of Bahrain" whose value may be counted toward that requirement, the definitions of those terms must be applied.

Subdivision (d)(iv)(C) defines "material produced in the territory of Bahrain or of the United States, or both" as "a good that is either wholly the growth, product or manufacture of Bahrain or of the United States, or both, or a new or different article of commerce that has been grown, produced or manufactured in the territory of Bahrain or of the United States, or both." Where the material is not wholly the growth, product or manufacture of Bahrain, it must become a "new or different article of commerce that has been grown, produced or manufactured in the territory of Bahrain." Thus, the value of non-Bahraini materials imported into Bahrain can not be included in the 35% value content requirement unless they are first converted into a "new or different article of commerce that has been grown, produced or manufactured in the territory of Bahrain." This requirement ensures that non-Bahraini

materials become a new or different article produced in Bahrain, *i.e.*, that they are transformed into Bahraini materials. Indeed, only the value of Bahraini materials may be included in the 35% value content requirement. *See* Gen. Note 30(d)(iv)(D).

However, for the Bahraini-origin items to be included in the 35% value-content requirement they must qualify as "materials." Subdivision 30(d)(iv)(B) defines a "material" as "a good, including a part or ingredient, that is used in the growth, production or manufacture of *another good* that is a new or different article of commerce that has been grown, produced or manufactured in Bahrain or of the United States, or both." (emphasis added). Thus, for an input's value to be included in the 35% calculation, it must meet this definition. It follows then that the good must be used in the production of another good that constitutes a new or different article of commerce. In other words, the Bahraini-origin material must itself be further processed or converted in Bahrain into *another good*. This conversion is separate and distinct from the subdivision (b)(ii) requirement of a "new or different article of commerce."

The 35% value content requirement appears in several preferential treatment programs including the Generalized Systems of Preferences (GSP), 19 U.S.C. §§ 2461-2465. The Federal Circuit has held that, for purposes of the GSP, the 35% value content requirement is only satisfied when the foreign input is first transformed into an originating material and then that originating material is used to manufacture or produce the imported good. *Torrington Co. v. United States*, 764 F.2d 1563 (Fed. Cir. 1985); *Meyer Corp., U.S. v. United States*, 43 F.4th 1325, 1331 (Fed. Cir. 2022).

At issue in *Torrington* was the eligibility of imported sewing machine needles for preferential duty treatment under the GSP. Torrington produced the needles from wire manufactured in a non-BDC and imported into Portugal. 764 F.2d at 1566. To be eligible for GSP treatment, a product must meet certain minimum content requirements, specifically, GSP treatment is available only "if the sum of (A) the cost or value of the materials produced in the beneficiary developing country . . . plus (B) the direct processing operations performed in the beneficiary developing country . . . is not less than 35 percent of the appraised value of such article at the time of its entry in

the customs territory of the United States." *Id* at 1565. CBP's implementing regulations, 19 C.F.R. § 10.177(a), define the expression "materials produced in the beneficiary developing country" (BDC) as "the constituent materials of which the eligible article is composed which are either: (1) Wholly the growth, product, or manufacture of the beneficiary developing country; or (2) Substantially transformed in the beneficiary developing country into a new and different article of commerce." *Id.*

The production of the imported sewing machine needles was a multistage manufacturing process that began with non-BDC wire. The wire is manufactured into swages and then manufactured into the sewing-machine needles. *Id.* at 1566-67. The legal issue before the Court was whether the imported wire used to produce the sewing needles was required to undergo two substantial transformations before the value of the wire was included in the 35% value content requirement. Torrington argued that the transformation of the wire into the sewing machine needles was sufficient, which is a single transformation. *Id.* at 1567. Conversely, the United States demonstrated that a single transformation is insufficient to change the

non-BDC wire into a material "produced in the developing country." *Id.* at 1567. The Federal Circuit held that the 35% value content requirement in the GSP statute required two substantial transformations. According to the Court, the wire was not a BDC product and, therefore, could not be considered a BDC material. *Id.* at 1567. However, if the wire was transformed "into an intermediate article of commerce, then the intermediate product would be an article produced in the BDC, and the value of *that* product (including the contribution of the wire to the value of that intermediate product) would be included." *Id.* The Court rejected Torrington's "single transformation" argument because it would have rendered the 35% value requirement in the GSP statute a nullity.

> If only a single transformation were necessary, then the "material produced" in the BDC would be the imported product itself. Customs would then face the problem of determining how much of the appraised value of the import resulted from materials produced in the BDC, when the only material produced was the import. The result would always be 100% since the product would always be a constituent material of itself. Congress clearly envisaged some way of separating the final product from its constituent materials, and the dual transformation requirement achieves this end.

764 F.2d at 1568.

*Torrington* is instructive here.  The 35% value content requirement in the GSP statute is identical to the requirement in General Note 30, HTSUS, and GSP's definition of the term "material" mirrors the definition of that term in General Note 30.  As with GSP, the 35% value content requirement in General Note 30 mandates a dual transformation.

Furthermore, subdivision (b)(ii) of General Note 30 requires that the non-Bahraini inputs be transformed into a "new and different article of commerce produced in Bahrain," *i.e.*, undergo a substantial transformation.  Thus, interpreting the 35% value-content requirement to require only this same single transformation would improperly render the second requirement of subdivision (b)(ii) superfluous.  *See TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001) ("[A] statute ought, upon the whole, be so constructed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quoting *Duncan v. Walker,* 533 U.S. 167, 174 (2001) (internal quotations omitted by *TRW* court)); *see also Bufkin v. Collins*, 145 S. Ct. 728, 741

(2025) (expressing reluctance "to treat statutory terms as surplusage in any setting.").

Although the phrase "double substantial transformation" does not appear in General Note 30 or the Implementation Act, the dual requirement is clearly gleaned from the structure of the statute.  For example, the term "double substantial transformation" does not appear in the statutory text of the GSP, and yet, the Federal Circuit held that a dual transformation was required.  *Torrington*, 596 F. Supp. 1085-86 ("Although not explicit, the dual requirement can be gleaned from the statute.")

The legislative history of the implementation act provides useful guidance in applying trade agreements domestically.  *See, e.g., Alcan Aluminum Corp.*, 165 F.3d at 903-904 (consulting the United States-Canada Free-Trade Agreement Implementation Act and its legislative history to interpret the HTSUS note at issue).  The legislative history of the Implementation Act establishes that the rules of origin for the UBFTA "parallel" the criteria for GSP.  In its report on the Executive Agreement to the U.S. House of Representatives Ways and Means Committee, the ITC explained that "[t]he rules [of origin in the

Executive Agreement] parallel the eligibility criteria in the U.S. GSP program for the majority of goods; origin would be accorded primarily on the basis of value content." *See U.S. Bahrain Free Trade Agreement: Potential Economywide and Selected Sectoral Effects* at xi (Oct. 2004)( ITC Publication 3276). The report further states that the Executive Agreement "treats most tariff categories under criteria that appear to track U.S. GSP rules and requires a basic regional value contribution []" citing to the HTSUS note providing for GSP treatment and its accompanying regulations. *Id.* The plain language of General Note 30, HTSUS, the Implementation Act, and its legislative history all make clear that the 35% value content requirement can only be satisfied with a dual transformation.

## III. THE SIDE LETTER AND CBP'S REGULATIONS CANNOT SUPPLANT THE RULES OF ORIGIN CONTAINED IN GENERAL NOTE 30, HTSUS

General Note 30, HTSUS, is the controlling authority for the rules of origin for preferential treatment under the UBFTA. Notwithstanding, JBF Bahrain argues that CBP's implementing regulations, including the Part 102 rules, require a tariff shift, and not a double substantial transformation, for preferential treatment under

the UBFTA.  According to JBF Bahrain, "[r]ather than implement a GSP-style double substantial transformation test, the USBFTA relies upon the Part 102 tariff-shifts to determine whether materials have been produced in the territory of one or both of the parties."  Pl.'s Br. at 16.  JBF Bahrain's argument is fundamentally flawed.  Neither the Side Letter nor CBP's implementing regulations can supplant General Note 30, HTSUS, which is the pertinent statutory authority.  *See Alcan Aluminum Corp.,* 165 F.3d at 904.

Finally, JBF Bahrain misconstrues the purpose of the Side Letter. The Side Letter addresses only the requirement that an imported good must be a "new or different article of commerce" grown or produced in the territory of Bahrain to qualify for preferential treatment under the UBFTA.  It offers no guidance on the second prong of General Note 30(b)(ii), namely, the 35% value content requirement including whether certain materials may be included in that calculation.

## V.    CBP'S ADMINISTRATIVE RULING IS NOT CONTROLLING IN THIS *DE NOVO* ACTION

JBF Bahrain devotes a portion its brief to criticizing the analysis reflected in Customs' headquarters ruling HQ H290625 (June 7, 2022).  *See, e.g.*, Pl. Br. at 18-22.  But the Court decides this case *de*

*novo* based on the record made before it and the law cited to it in briefing—not based on a non-binding Customs ruling or Customs' analysis. *Energizer Battery, Inc. v. United States*, 190 F. Supp. 3d 1308, 1315 (Ct. Int'l Trade 2016) ("[T]he fact that CBP may have incorrectly applied a legal test in its analysis or that Defendant may have abandoned CBP's analysis in its briefing to the court is neither dispositive nor sufficient reason for the court to find in Plaintiff's favor.").

## CONCLUSION

For these reasons, we respectfully request that the Court grant the Government's cross motion for partial summary judgment and deny plaintiff's motion for partial summary judgment.

<div style="margin-left: 40%;">

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:   /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

</div>

|                              | /s/ Marcella Powell                  |
|------------------------------|--------------------------------------|
|                              | MARCELLA POWELL                      |
| Of Counsel:                  | Senior Trial Counsel                 |
| Taylor R. Bates              | Civil Division, U.S. Dept. of Justice |
| Office of the                | Commercial Litigation Branch         |
| Assistant Chief Counsel      | 26 Federal Plaza, Room 346           |
| International Trade Litigation | New York, New York 10278           |
| U.S. Customs and             | Tel. (212) 264-9230                  |
| Border Protection            | Attorneys for Defendant              |

Dated: December 12, 2025

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. M. MILLER BAKER, JUDGE

| | |
|---|---|
| JBF BAHRAIN W.L.L., | : |
| as successor-in-interest to | : |
| JBF Bahrain S.P.C., | : |
| | : |
| Plaintiff, | : |
| | :    Court No. 23-00067 |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |
| | : |

## <u>CERTIFICATE OF COMPLIANCE</u>

The brief complies with the 14,000 word limitation imposed by

Chambers Procedures.  The word count is 5,582.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    <u>/s/ Justin R. Miller</u>
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

31

|  | /s/ Marcella Powell |
|---|---|
|  | MARCELLA POWELL |
| Of Counsel: | Senior Trial Counsel |
| Taylor R. Bates | Civil Division, U.S. Dept. of Justice |
| Office of the | Commercial Litigation Branch |
| Assistant Chief Counsel | 26 Federal Plaza, Room 346 |
| International Trade Litigation | New York, New York 10278 |
| U.S. Customs and | Tel. (212) 264-9230 |
| Border Protection | Attorneys for Defendant |

Dated: December 12, 2025