**Slip Op. 26-99**

**UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

---

**Court No. 23-00067**

---

JBF BAHRAIN W.L.L., as successor-in-interest to JBF Bahrain S.P.C.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*.

---

Before: M. Miller Baker, Judge

**OPINION**

[Denying Plaintiff's motion for partial summary judgment and granting Defendant's cross-motion for partial summary judgment.]

Dated: August 19, 2026

*Lawrence M. Friedman* and *Pietro N. Bianchi*, Barnes, Richardson & Colburn LLP, Chicago, IL, on the briefs for Plaintiff.

*Justin R. Miller*, Attorney-in-Charge, International Trade Field Office, and *Marcella Powell*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, New York, NY, on the briefs for Defendant. Of counsel for Defendant was *Taylor R. Bates*, Office of the Assistant Chief Counsel,

International Trade Litigation, U.S. Customs and Border Protection, New York, NY.

*Baker*, Judge: The United States and Bahrain have a free-trade agreement. To receive its benefit, at least 35 percent of an import's value must derive from those nations' materials and processing. Here, the litigants disagree over the applicable test for determining when the cost of a third-country input counts toward that requirement.

The government argues that under the Harmonized Tariff Schedule of the United States (HTSUS) provision codifying the agreement, a third-country input must twice undergo a "substantial transformation." This is a long-standing term of art that looks to various factors on a case-by-case basis.

On the other hand, the two nations agreed in a side letter to use a different standard, the tariff-shift test, which an agency regulation incorporates. The importer argues that this metric governs and that under it, the cost of a third-country input counts toward the 35-percent requirement so long as its processing results in a single HTSUS classification change.

The court agrees with the government. The HTSUS—a statute—is clear. Unless the importer can show that a third-country input underwent a double substantial transformation, its cost doesn't count toward the 35-percent requirement. The agency regulation adopting the tariff-shift test—even though it

reflects the side letter agreed to by the United States and Bahrain—is ultra vires and therefore invalid.

But even if the tariff-shift provisions could apply here, the importer misreads them. They mimic the statute's substantial-transformation framework by requiring that the tariff shift occur twice. First, the processing of a third-country input into an intermediate good must result in a classification change. In turn, the conversion of that article into a final product must yield a second such change.

In short, the importer's legal theory here is doubly wrong. The court therefore grants partial summary judgment for the government.

I

In September 2004, the two countries signed the United States–Bahrain Free Trade Agreement. *See* H.R. Doc. 109–71, 109th Cong., 1st Sess., at 5–209 (2005) (text of the Agreement). As relevant here, it provides for preferential tariff treatment for certain goods produced in one of the signatories and exported to the other.

Chapter Four's "Rules of Origin" govern whether a product exported from either nation is an "originating good" and thereby eligible for the preference. Art. 4.1, *id.* at 69. As relevant here, merchandise qualifies when it satisfies two requirements.

First, it must be "a new or different article of commerce that has been grown, produced, or manufactured" in either country. Art. 4.1(b), *id.* at 69. Second, the sum of the value of inputs made and processing performed in one or both signatory nations must be "not less than 35 percent of the appraised value of the good" at the time of importation. *Id.*

Article 4.2 defines "new or different article of commerce" as "a good that has been substantially transformed from a *good or material that is not wholly the growth, product, or manufacture of one [or]*[1] *both of the Parties* and that has a new name, character, or use distinct from the good or material from which it was transformed." *Id.* at 69 (emphasis added).[2]

That "good or material that is not wholly the growth, product, or manufacture of one [or] both of the Parties" in turn must itself be "a new or different article of commerce that has been grown, produced, or manufactured" in one of the signatory nations. Art. 4.14, *id.* at 74. And so it too must derive from a "good or material that is not wholly the growth, product, or manufacture of one [or] both of the Parties." Art. 4.2, *id.* at 69.

---

1 The original text uses "of," an obvious typo.

2 Article 4.14 in turn provides a detailed definition of "substantially transformed." *See id.* at 75.

The upshot is that for the cost of a third-country input to count toward the 35-percent requirement, it must undergo double substantial transformation—first into an intermediate good, and then once again into a final product.

On the same day they signed the Agreement, the two countries exchanged correspondence (the Side Letter). It provides that to determine "whether a good is a 'new or different article of commerce that has been grown, produced, or manufactured' for purposes of [Article] 4.1(b) of the Agreement, each Party should be guided by the specific rules in tariff classification set forth in section 102.20 of the United States Customs Regulations . . . ." ECF 51-4, at 2–3.

The Customs regulation referenced in the Side Letter in turn applies a tariff-shift test to determine the country of origin of a final product that incorporates a foreign input. *See* 19 C.F.R. § 102.20.[3]

In November 2005, the President submitted the Agreement and voluminous supporting papers to Congress for approval as required by 19 U.S.C. § 3805, which governs the effectuation of trade agreements.

---

[3] Under the tariff-shift method, an imported "good, or [imported] component of a good, is considered of United States origin if the subsequent manufacturing processes in the United States are sufficient to change that good or component's tariff classification." *Bestfoods v. United States*, 260 F.3d 1320, 1322 (Fed. Cir. 2001) (citing 19 C.F.R. § 102.11).

*See* H.R. Doc. 109–71, 109th Cong., 1st Sess.[4] According to the government, the Side Letter was not among those documents. *See* ECF 72, at 5.[5]

In early 2006, Congress passed the United States–Bahrain Free Trade Agreement Implementation Act. *See* Pub. L. 106–169, 119 Stat. 3581, 19 U.S.C. § 3805 note. This law adopts the Agreement's rules of origin in all material respects. *See* Pub. L. 106–169, § 202, 119 Stat. at 3585–91. It never mentions the Side Letter and does not incorporate its terms.

The Implementation Act also allows the President to "proclaim such actions" as necessary to "appropriately" carry out its provisions. *Id.* § 103(a)(1), 119 Stat.

---

[4] While Congress has allowed the President to negotiate trade agreements with foreign countries in certain circumstances, *see, e.g.*, 19 U.S.C. § 3803, such agreements are not self-executing and "shall enter into force with respect to the United States if (and only if)" the President satisfies various procedural requirements. As relevant here, the statute required the President to notify Congress, timely submit a description of changes to existing law that would be needed "to bring the United States into compliance with the agreement," and then submit a full copy of the text of the agreement and a specific universe of supporting documents. 19 U.S.C. § 3805(a)(1), (2). Even if such procedural prerequisites are satisfied, as they were here, an agreement does not take effect unless an implementing act becomes law. *Id.* § 3805(a)(1)(D).

[5] But oddly, the Side Letter *is* included in the "final text" of Article IV of the Agreement found on the website of the United States Trade Representative. *See* ECF 51-5.

at 3583. Exercising that authority, in July 2006 the President issued Proclamation 8039, "To Implement the United States–Bahrain Free Trade Agreement, and for Other Purposes." 71 Fed. Reg. 43,635.

Among other things, the President found it necessary to include the Implementation Act's rules of origin in the HTSUS.[6] *See* 71 Fed. Reg. 43,635, ¶ 5. In doing so, he did not mention, much less incorporate, the Side Letter.

The President directed that the HTSUS be modified by incorporating the changes recommended in Annex I to the International Trade Commission's Publication 3830, *Modifications to the Harmonized Tariff Schedule of the United States to Implement the United States–Bahrain Free Trade Agreement*. *Id.* at 43,636, ¶ (1). Like Proclamation 8039, the Commission's recommen-

---

[6] This body of ordinances is treated as "statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1); *see also V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1324 (Fed. Cir. 2025) (en banc) ("The HTSUS itself is indeed a statute but is not published physically in the United States code.") (cleaned up), *aff'd*, 607 U.S. 229 (2026). Another law defines this collection as consisting of General Notes, General Rules of Interpretation, Additional U.S. Rules of Interpretation, sections I to XXII of the schedule, and the Chemical Appendix. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100–418, title I, § 1204(a), 102 Stat. 1107, 1148.

ded changes to the HTSUS did not mention or incorporate the Side Letter.

One of those changes was the addition of a new General Note 30 to the HTSUS in July 2006.[7] It materially tracks the rules of origin found in the Agreement and carried over into Section 202 of the Implementation Act. Thus, as relevant here, a third-country input must undergo double substantial transformation to count toward the 35-percent origination requirement. *See* General Note 30(b)(ii); *id.* 30(d)(iv)(C), (D).

In addition to authorizing the President to promulgate HTSUS changes such as General Note 30, the Implementation Act also empowers Customs to enact regulations to "appropriately" carry out the law's provisions. § 103(a)(1), 119 Stat. at 3583. The agency exercised this authority in 2007 and 2008. *See* 72 Fed. Reg. 58,511 (interim rule); 73 Fed. Reg. 42,679 (final rule).

The regulations adopt the rules of origin in the Agreement, the Implementation Act, and General Note 30, *see* 19 C.F.R. § 10.810, except in one critical respect—the definition of "new or different article of commerce." *See id.* § 10.809(i). Under the new meaning, such an article "exists when the country of origin of a good which is produced in a Party from foreign

---

[7] General Note 30 and the regulations discussed below are excerpted in the Addendum to this opinion.

materials is determined to be that country" under 19 C.F.R. "§§ 102.1 through 102.21." *Id.*[8]

As relevant here, the Part 102 regulations provide that "the country of origin of [an] imported good[ ]" is "the country in which . . . [e]ach foreign material incorporated in that good undergoes an applicable change in tariff classification set out in § 102.20." *See* 19 C.F.R. § 102.11(a)(3). In other words, the country of origin of a product made with a foreign input is determined by a tariff-shift test.

II

According to its statement of undisputed facts, JBF Bahrain, the plaintiff here, imported film[9] from Bahrain in 2015. ECF 74, ¶ 1. Customs found the product ineligible for duty-free treatment under the Agreement because the third-country inputs "did not undergo double substantial transformation" and thus could not count toward the 35-percent requirement.

---

[8] Customs explained that it based this redefinition on the Side Letter. *See* 72 Fed. Reg. at 58,513.

[9] The technical name is "biaxially oriented polyethylene terephthalate film." According to the importer, this product is used for packaging and coverings. ECF 51, at 3.

U.S. Customs and Border Protection Ruling HQ H290625 (June 7, 2022) (Customs Ruling) at 4.[10]

The importer duly filed a protest, which was denied.[11] Customs Ruling at 23. The agency explained that the film's third-country inputs were "not substantially transformed when processed" into an intermediate product. *Id*. at 12.

JBF then filed suit in this court under 19 U.S.C. §§ 1514(a) and 1515(c) to contest the denial. *See generally* ECF 26 (amended complaint). The court has subject-matter jurisdiction under 28 U.S.C. § 1581(a).

Both parties move for partial summary judgment. Such relief is available "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[10] The court takes judicial notice of this document that can be accurately and readily obtained from the agency's website, *see* https://rulings.cbp.gov/search?term=HQ%20H290625&collection=ALL&commodityGrouping=ALL&sortBy=DATE_DESC&pageSize=100&page=1, a source whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2); *see also id*. 201(c)(1) (allowing the court to take judicial notice sua sponte).

[11] For background on the classification of entries and the protest process, see *ARP Materials, Inc. v. United States*, 520 F. Supp. 3d 1341, 1346–47 (CIT 2021), *aff'd*, 47 F.4th 1370 (Fed. Cir. 2022).

USCIT R. 56(a). The litigants agree that their respective motions only raise a question of law.

III

JBF and the government submitted dueling statements of undisputed material facts and responses. *See* USCIT R. 56.3(a), (b); ECF 51-1 (JBF's statement); ECF 67-2 (government's response); ECF 67-3 (government's statement); ECF 74 (JBF's response). Based on those filings, the court finds the following facts to be material and undisputed:

1. In 2015, JBF imported the film in a single entry. ECF 67-2, ¶ 1.

2. Customs denied that entry duty-free treatment under the Agreement. *Id.* ¶ 5.

3. The agency then liquidated the entry. *Id.* ¶ 6.

4. At liquidation, Customs classified the film under subheading 3920.62.0090. *Id.* ¶ 9.

5. JBF protested the liquidation, asserting that the film qualified for duty-free entry under the Agreement. *Id.* ¶ 7.

6. The agency denied the protest. *Id.* ¶ 12.

7. The film was manufactured in Bahrain with third-country inputs before its importation into the United States. ECF 74, ¶ 1.

IV

A

Pared to the bone, the question in this case is whether General Note 30(d)(iv)(D) or 19 C.F.R. § 10.809(i) governs the definition of "new or different article of commerce." The former uses the substantial-transformation test found in the Agreement and the Implementation Act; the latter uses the tariff-shift standard of 19 C.F.R. § 102.20 referenced in the Side Letter.

JBF invokes the familiar principle that "an agency is bound by its own regulations." *Wagner v. United States*, 365 F.3d 1358, 1361 (Fed. Cir. 2004) (citing *Service v. Dulles*, 354 U.S. 363, 388 (1957)); *see* ECF 51, at 17. It contends that because the Implementation Act authorized Customs to issue 19 C.F.R. § 10.809(i), the latter provision is "controlling authority that clarif[ies] the meaning of [General Note] 30." ECF 73, at 6.[12] This regulation, the importer observes

[12] JBF also asserts that the two countries signed the Side Letter because they "were not satisfied that the substantial transformation requirement in [General Note] 30(d)(iv)(D) was sufficiently free of ambiguity and subjectivity." *Id.* at 9. The President, however, promulgated General Note 30 some two years *after* Bahrain and the U.S. signed the Agreement. (Doc Brown, call your office.) But recasting the importer's argument in more plausible terms, it certainly appears that both nations meant for the Side Letter to

(footnote continues on next page)

(*see id.* at 12), is consistent with both the Side Letter and Customs's stated intention in 2008 "to apply the Part 102 [tariff-shift] rules to any [free-trade agreement] negotiated in the future using the substantial-transformation standard." 73 Fed. Reg. 43,385, 43,386–87.

The government responds that the regulation, and perforce the Side Letter—which is at best legislative history once removed, as Congress presumably never saw it—cannot oust General Note 30's plain language, which is the governing statutory authority. ECF 72, at 27–28. And that language unambiguously defines "new or different article of commerce" using the substantial-transformation test, General Note 30(d)(iv)(D), which in turn is expressly defined in the statute, *see id.* 30(d)(iv)(H).

The court agrees with the government.

For reasons that are not apparent, the President evidently did not transmit the Side Letter to Congress. The latter—presumably because its members were unaware of it—in turn did not enact the Side Letter into law.

Instead, in the Implementation Act Congress adopted the Agreement's rules of origin, which define "new or different article of commerce" using the

---

supersede *the Agreement*'s adoption of the substantial-transformation test.

substantial-transformation test. *See* § 202, 119 Stat. at 3585–91. And as described above, the President, exercising power conferred by the Act, promulgated General Note 30—a statute—which carries forward the same test.

Congress also authorized Customs to publish regulations to ensure the statute's provisions were "*appropriately* implemented." § 103(a)(1), 119 Stat. at 3583 (emphasis added). In issuing 19 C.F.R. § 10.809(i), the agency exceeded its remit, as that provision purports to substantively redefine a term—"new or different article of commerce"—already delineated in the Implementation Act and General Note 30. An "appropriate" regulation can only be one that is consistent with the statute.

When "a court . . . conclude[s] the regulation is inconsistent with the statutory language . . . , the regulation will not control." *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."); *GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008) ("When a regulation directly contradicts a statute, the regulation must yield.").

Finally, JBF's invocation of the Federal Circuit's decision in an earlier iteration of *Bestfoods v. United States* is unavailing. *See* ECF 51, at 16. There, an

importer challenged Treasury regulations imposing a tariff-shift test to determine the country of origin of North American Free Trade Agreement goods. It argued the regulations violated the federal marking statute, 19 U.S.C. § 304, which had been judicially construed to require that imported articles undergo a "substantial transformation"[13] to avoid being denominated as of foreign origin.

The Federal Circuit upheld the tariff-shift regulations. It reasoned that they did "not conflict with the marking statute," which "does not specify what methodology must be used to determined what is an 'article of foreign origin.'" 165 F.3d 1371, 1375 (Fed. Cir. 1999). "When the NAFTA marking rules displaced the *Gibson-Thomsen* approach for purposes of NAFTA goods, it was not necessary to amend the marking statute in order to effect that change, because nothing in the statute required adherence to the [substantial-transformation] approach." *Id*. at 1375–76.

Here, by contrast, the relevant statute demands adherence to the substantial-transformation test. *See* General Note 30(d)(iv)(D). Not only that, it prescribes how that standard is to be applied. *See id.* 30(d)(iv)(H). The court therefore holds that the definition of "new or different article of commerce" found in 19 C.F.R.

---

[13] *See United States v. Gibson-Thomsen Co.*, 27 C.C.P.A. 267, 273 (1940).

§ 10.809(i) does not apply. Instead, the one found in General Note 30(d)(iv)(D) governs.

B

Even if 19 C.F.R. § 10.809(i)'s definition of "new or different article of commerce" were enforceable, JBF misreads how Part 102's rules of origin work in tandem with Customs's regulations in Part 10 implementing the Agreement.

Save for that definition, the implementing regulations mirror the rules of origin found in Article 4.1(b) of the Agreement, Section 202 of the Implementation Act, and General Note 30(b)(ii). *See* 19 C.F.R. §§ 10.809(c), (g), (h); 10.810(a)(2), (b). JBF does not dispute that under these provisions, the processing of a third-country input must twice result in a "new or different article of commerce."

Section 10.809(i) defines that term by looking to 19 C.F.R. "§§ 102.1 through 102.21." *Id.* § 10.809(i). The gatekeeper provision in that range is § 102.11, which as relevant here sets out general rules to "determin[e] the country of origin of imported goods." *Id.* § 102.11.

JBF contends, and the court agrees,[14] that § 102.11(a)(3) governs when an intermediate good

---

[14] Assuming, as the importer argues, that § 10.809(i)'s definition of "new or different article of commerce" replaces General Note 30's.

made with a third-country input becomes a "new or different article of commerce" for § 10.809(i) purposes. The former regulation provides that the country of origin is where "[e]ach foreign material incorporated in that good undergoes" a tariff shift under "102.20." *Id.* § 102.11(a)(3).

Under § 10.810(a)(2), the "new or different" intermediate good made from a third-country input in turn must be processed into another "new or different" final product. But instead of once again relying on § 102.11(a)(3), which points to § 102.20's tariff-shift provisions to make that determination, JBF changes its tune and claims that 19 C.F.R. § 102.11(a)(2) governs. *See* ECF 51, at 22.

This provision states that the processing country is the country of origin when a good made there "is produced *exclusively* from domestic materials." 19 C.F.R. § 102.11(a)(2) (emphasis added). According to the importer, when a foreign input undergoes a tariff shift and is deemed to originate from the processing country, the new or different intermediate good is a "domestic material." *See* ECF 51, at 21. So voilà, JBF contends, a final product created solely from that intermediate good is a second "new or different article of commerce." *See id.* at 22.

But § 102.11(a)(2) cannot apply for § 10.809(i) purposes, because a "new or different article of commerce" is one "which is produced in a Party *from* foreign materials." 19 C.F.R. § 10.809(i) (emphasis added). The

former, though, only encompasses merchandise "produced *exclusively* from domestic materials." *Id.* § 102.11(a)(2) (emphasis added).

Thus, § 102.11(a)(3) must apply to the final product made from an intermediate good that incorporates foreign materials. As discussed above, that provision requires that "[e]ach foreign material incorporated in that good" undergo "an applicable change in tariff classification set out in *§ 102.20*." *Id.* § 102.11(a)(3) (emphasis added). That means the processing of the intermediate good into a final product must also result in a tariff shift for the latter to be a "new or different article of commerce" for § 10.809(i) purposes.

Ironically, the Side Letter confirms this reading of the regulations. Recall that it states that "whether a good is a 'new or different article of commerce'" should be governed by "the specific rules in tariff classification set forth in *section 102.20* of the United States Customs Regulations . . . ." ECF 51-4, at 2–3 (emphasis added). JBF's theory of the case thus lives by the Side Letter and dies by the Side Letter. If that document's tariff-shift test governs here, it applies to *both* the intermediate good and the final product, not just the former as the importer contends.[15]

---

[15] If a de novo trial on the merits were to yield the same factual findings made by Customs, it would show that the

(footnote continues on next page)

* * *

For an import from Bahrain made with third-country inputs to qualify for preferential treatment under the Agreement, at least 35 percent of its value must derive from processing in, and materials made in, one or both signatory nations. For the cost of a third-country input to count toward that number, it must undergo double substantial transformation as prescribed by General Note 30. But even if the regulation's definition of "new or different article of commerce" supplanted the statute's as JBF contends, the importer would have to show that the inputs underwent a double tariff shift.

---

processing of the intermediate good into the final product did not result in a tariff shift. JBF's brief observes that the agency classified the intermediate product it made in Bahrain from third-country inputs "in [HTSUS subheading] 3920.62.0090." ECF 51, at 20. And it also acknowledges in its statement of uncontested facts that the agency correctly classified the final product "in [HTSUS subheading] 3920.62.0090." ECF 51-4, ¶ 9. At least based on the facts that Customs found, creation of the final merchandise did not result in the required change in the applicable subheading (3920.62.0090). *See* 19 C.F.R. § 102.20.

The court therefore denies JBF's motion for partial summary judgment (ECF 51) and grants the government's cross-motion (ECF 72). The parties shall file a joint status report within 30 days. *See* ECF 53.

Dated: August 19, 2026 /s/ *M. Miller Baker*
New York, NY Judge

## ADDENDUM

Contents:

General Note 30 excerpts .................................................. 1a

Subdivision (b)........................................................... 1a

Subdivision (d) .......................................................... 2a

Customs Part 10 regulation excerpts ............................... 4a

19 C.F.R. § 10.809, "Definitions" ................................ 4a

19 C.F.R. § 10.810, "Originating goods" ...................... 5a

Customs Part 102 regulation excerpts ............................. 6a

19 C.F.R. § 102.1(d), "Definitions"............................... 6a

19 C.F.R. § 102.11, "General Rules"............................ 7a

19 C.F.R. § 102.20, "Specific rules by tariff classification" ......................................................................... 8a

## General Note 30 excerpts[1]

**Subdivision (b)**

For the purposes of this note, subject to the provisions of subdivisions (c), (d), (e), (g) and (h) thereof, a good imported into the United States is eligible for treatment as an originating good . . . under the terms of this note only if—

> * * *
>
> **(ii)** . . . the good is a new or different article of commerce that has been grown, produced or manufactured in the territory of Bahrain or of the United States, or both, and the sum of—
>
> > **(A)** the value of each material produced in the territory of Bahrain or of the United States, or both, and
> >
> > **(B)** the direct costs of processing operations performed in the territory of Bahrain or of the United States, or both,
>
> is not less than 35 percent of the appraised value of the good at the time the good is entered into the territory of the United States; . . .
>
> * * *

---

[1] All underlined terms appear that way in the original text of General Note 30.

and is imported directly into the territory of the United States from the territory of Bahrain and meets all other applicable requirements of this note. For purposes of this note, the term "good" means any merchandise, product, article or material.

* * *

**Subdivision (d)**

* * *

**(iv)** Definitions. For the purposes of this note:

* * *

**(B)** The term "material" means a good, including a part or ingredient, that is used in the growth, production or manufacture of another good that is a new or different article of commerce that has been grown, produced, or manufactured in Bahrain or of[2] the United States, or both.

**(C)** The term "material produced in the territory of Bahrain or of the United States, or both" means a good that is . . . a new or different article of commerce that has been grown, produced or manufactured in the territory of Bahrain or of the United States, or both.

---

[2] So in original. An obvious error.

**(D)** The term "new or different article of commerce" means, except as provided in this subdivision, a good that—

**(1)** has been substantially transformed from a good or material that is not wholly the growth, product or manufacture of Bahrain or of the United States, or both; and

**(2)** has a new name, character or use distinct from the good or material from which it was transformed,

but a good shall not be considered a new or different article of commerce by virtue of having undergone simple combining or packaging operations, or mere dilution with water or another substance that does not materially alter the characteristics of the good.

* * *

**(H)** The term "substantially transformed" means, with respect to a good or a material, changed as the result of a manufacturing or processing operation so that—

**(1)** **(aa)** the good or material is converted from a good that has multiple uses into a good or material that has limited uses;

**(bb)** the physical properties of the good or material are changed to a significant extent; or

**(cc)** the operation undergone by the good or material is complex by reason of the number of processes and materials involved and the time and level of skill required to perform those processes; and

**(2)** the good or material loses its separate identity in the manufacturing or processing operation.

* * *

**Customs Part 10 regulation excerpts**

**19 C.F.R. § 10.809, "Definitions"**

For purposes of §§ 10.809 through 10.817:

* * *

**(c)** ***Good.*** "Good" means any merchandise, product, article, or material;

* * *

**(g)** ***Material.*** "Material" means a good, including a part or ingredient, that is used in the growth, production, or manufacture of another good that is a new or different article of commerce that has been grown, produced, or manufactured in one or both of the Parties;

**(h)** ***Material produced in the territory of one or both of the Parties.*** "Material produced in the territory of one or both of the Parties" means a good that is . . . a new or different article of commerce that has been grown, produced, or manufactured in the territory of one or both of the Parties;

**(i)** ***New or different article of commerce.*** A "new or different article of commerce" exists when the country of origin of a good which is produced in a Party from foreign materials is determined to be that country under the provisions of §§ 102.1 through 102.21 of this chapter[.]

* * *

**19 C.F.R. § 10.810, "Originating goods"**

**(a)** ***General.*** A good will be considered an originating good under the BFTA when imported directly from the territory of a Party into the territory of the other Party only if:

* * *

**(2)** The good is a new or different article of commerce, as defined in § 10.809(i) of this subpart, that has been grown, produced, or manufactured in the territory of one or both of the Parties, . . . , and meets the value-content requirement specified in paragraph (b) of this section; . . .

* * *

**(b)** ***Value-content requirement.*** A good described in paragraph (a)(2) of this section will be considered an originating good under the BFTA only if the sum of the value of materials produced in one or both of the Parties, plus the direct costs of processing operations performed in one or both of the Parties, is not less than 35 percent of the appraised value of the good at the time the good is entered into the territory of the United States.

* * *

**Customs Part 102 regulation excerpts**

**19 C.F.R. § 102.1, "Definitions"**

* * *

**(d)** ***Domestic material.*** "Domestic material" means a material whose country of origin as determined under these rules is the same country as the country in which the good is produced.

**(e)** ***Foreign material.*** "Foreign material" means a material whose country of origin as determined under these rules is not the same country as the country in which the good is produced.

* * *

**19 C.F.R. § 102.11, "General Rules" (within Subpart B, "Rules of Origin")**

The following rules shall apply for purposes of determining the country of origin of imported goods other than textile and apparel products covered by § 102.21.

**(a)** The country of origin of a good is the country in which:

**(1)** The good is wholly obtained or produced;

**(2)** The good is produced exclusively from domestic materials; or

**(3)** Each foreign material incorporated in that good undergoes an applicable change in tariff classification set out in § 102.20 and satisfies any other applicable requirements of that section, and all other applicable requirements of these rules are satisfied.

* * *

**19 C.F.R. § 102.20, "Specific rules by tariff classification"**

The following rules are the rules specified in § 102.11(a)(3) and other sections of this part. Where a rule under this section permits a change to a subheading from another subheading of the same heading, the rule will be satisfied only if the change is from a subheading of the same level specified in the rule.

| **HTSUS** | **Tariff shift and/or other requirements** |
|---|---|
| * * * | * * * |
| (G) | Section VII: Chapters 39 through 40 |
| * * * | * * * |
| 3920.10–3921.90 | * * *<br>A change to any other good of subheading 3920.10 through 3921.90 from any other subheading, including another subheading within that group. |